# EXHIBIT C

Flynn v. Estevez, 221 So.3d 1241 (2017)

346 Ed. Law Rep. 653, 42 Fla. L. Weekly D1443

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by Rubinstein v. Temple Israel Early Learning
Center, Mich.App., February 22, 2018

221 So.3d 1241
District Court of Appeal of Florida,
First District.

Patrick FLYNN, as Parent and Guardian of S.F., a
Minor Child, Appellant,
v.
Felipe ESTEVEZ, Bishop of the Diocese of St.
Augustine, Appellee.

CASE NO. 1D15–3923
|
Opinion filed June 27, 2017

**Synopsis**
**Background:** After his non-immunized son was denied
admission to private religious school, parent brought
action against religious diocese, which operated school,
seeking injunctive and declaratory relief, claiming that
school's policy, requiring that all students be immunized
as a condition of admission, violated his statutory right to
exempt his child from compulsory immunizations. The
Circuit Court, Duval County, Karen K. Cole, J., dismissed
action, and parent appealed.

**[Holding:]** The District Court of Appeal, Makar, J., held
that ecclesiastical abstention doctrine, also called the
church autonomy doctrine, precluded court from wading
into the religious controversy between diocese and parent.

Affirmed.

Bilbrey, J., concurred and filed opinion.

Kelsey, J., concurred in result only and filed opinion.

West Headnotes (8)

[1]  **Religious Societies**
     ⬅Judicial supervision in general

"Church autonomy doctrine," or "ecclesiastical
abstention doctrine," prevents civil courts from
deciding matters that require adjudication of
theological controversy, church discipline,
ecclesiastical government, or the conformity of
the members of the church to the standard of
morals required of them, such that secular courts
must accept the decision by the highest
ecclesiastical authority on such matters.

4 Cases that cite this headnote

[2]  **Religious Societies**
     ⬅Judicial supervision in general

Church autonomy doctrine, or ecclesiastical
abstention doctrine, precludes secular courts
from becoming arbiters of religious matters and
the circumvention or erosion of church doctrine
by those who disagree with it.

3 Cases that cite this headnote

[3]  **Constitutional Law**
     ⬅Ecclesiastical matters

Church autonomy doctrine, or ecclesiastical
abstention doctrine, which has roots in both the
free exercise and establishment clauses of the
First Amendment has its core application in
cases where a court intrudes on a church's
autonomous management of its own internal
affairs and property, thereby either burdening or
inhibiting the exercise of religious freedom (free
exercise clause) or fostering an excessive
government entanglement with religion
(establishment clause). U.S. Const. Amend. 1.

1 Cases that cite this headnote

[4]  **Religious Societies**
     ⬅Judicial supervision in general

Flynn v. Estevez, 221 So.3d 1241 (2017)
346 Ed. Law Rep. 653, 42 Fla. L. Weekly D1443

Simply because a church is involved as a litigant does not make the matter a religious one and subject to church autonomy doctrine, or ecclesiastical abstention doctrine, and instead, inquiry must be made as to the nature of the dispute and whether it can be decided on neutral principles of secular law without a court intruding upon, interfering with, or deciding church doctrine.

4 Cases that cite this headnote

[5] **Health**
☞Vaccination and immunization

Neutral state laws compelling immunizations are generally considered to be constitutionally valid ones that do not violate religious freedoms.

Cases that cite this headnote

[6] **Education**
☞Admission and attendance

Parent, whose son was not immunized and was denied admission to private religious school, whose policy required that all students be immunized as a condition of admission, did not have free-standing federal or state constitutional right of religious freedom to refuse immunizations for his child as a condition of school admission.

Cases that cite this headnote

[7] **Constitutional Law**
☞Self-Executing Provisions

A legislative license is not needed to exercise a constitutional freedom.

Cases that cite this headnote

[8] **Education**
☞Admission and attendance
**Religious Societies**
☞Judicial supervision in general

Ecclesiastical abstention doctrine, also called the church autonomy doctrine, precluded court from wading into the religious controversy between diocese, which operated private religious school, whose policy required that all students be immunized as a condition of admission, and parent seeking admission of his non-immunized son to first grade; diocese had religiously-based immunization policy with which parent disagreed, parent sought the power of the State to compel diocese to depart from its point-of-view and admit his non-immunized son, but doing so would further parent's own religious views at the expense of the diocese's on the topic of immunizations, and case presented religious disagreement between a church and one of its members for which abstention was appropriate. Fla. Stat. Ann. § 1003.22(5).

Cases that cite this headnote

**\*1243** An appeal from the Circuit Court for Duval County. Karen K. Cole, Judge.

**Attorneys and Law Firms**

David Dancu, of Naples, Florida, Alan Phillips, of Arden, North Carolina, for Appellant.

Dennis E. Guidi and Michael J. Korn, of Jacksonville, Florida, for Appellee.

**Opinion**

MAKAR, J.,

The Catholic Diocese of St. Augustine, Florida, through its Bishop Felipe Estevez (whom we'll call "the Diocese" for simplicity), seeks jurisdictional autonomy under its

Flynn v. Estevez, 221 So.3d 1241 (2017)

346 Ed. Law Rep. 653, 42 Fla. L. Weekly D1443

ecclesiastical powers to prevent a secular court from reviewing its decision to require that all students admitted to its schools be immunized as required by Florida law. Its policy, however, conflicts with a statutory exemption that allows parents to object on religious grounds to immunization of their children as a condition of admission to Florida public and private schools. The trial court concluded that the ecclesiastical abstention doctrine, also called the church autonomy doctrine, precluded it from wading into the religious controversy between the Diocese and a Catholic parent seeking admission of his non-immunized son to first grade. We agree.

I.

Patrick Flynn and his wife have eight children, all of whom attended schools under the control of the Diocese to ensure a comprehensive Catholic education. Earlier in their lives, some of the older children received vaccinations prior to the Flynns deciding that doing so was inconsistent with their relationship with God. The youngest—who has not been vaccinated—graduated in 2015 from kindergarten at Holy Spirit School, a private Catholic elementary school in Jacksonville, Florida, operated by the Diocese, the latter wielding ecumenical authority over elementary and high schools under its dominion in Northeast Florida. The Diocese previously allowed non-vaccinated students to attend its schools but changed its policy for the 2015–2016 school year, requiring that all students be immunized as a condition of admission. As a result, Flynn provided the school with his religious objection in writing[1] and attempted to resolve the matter internally with the Diocese. Nonetheless, his rising-first-grader was denied admission, prompting Flynn to sue in circuit court for injunctive and declaratory relief, claiming the new policy violated his statutory right to exempt his child from compulsory immunizations at Holy Spirit.

Student immunization is pervasive. Like every other state,[2] Florida imposes student immunization requirements on both public *1244 and private schools from prekindergarten to grade twelve. § 1003.22, Fla. Stat. (2009). As a "private school" under Florida's education statutes,[3] Holy Spirit must comply with various laws including the one mandating that students be immunized against communicable diseases.[4] Statutory exemptions exist such as a medical exemption certified by a licensed physician, a temporary exemption for transferees and homeless children, and so on. Id. §

1003.22(5)(a)-(e). The Department of Health can also determine "that, according to recognized standards of medical practice, any required immunization is unnecessary or hazardous." Id. § 1003.22(5)(d). During any declared communicable disease emergency, children "identified as not being immunized against the disease for which the emergency has been declared shall be temporarily excluded from school" until a county's health department specifies. Id. § 1003.22(9).

Florida's statutory religious exemption provides that immunization requirements do not apply if "[t]he parent of the child objects in writing that the administration of immunizing agents conflicts with his or her religious tenets or practices." § 1003.22(5), Fla. Stat. The exemption has existed for decades and been interpreted to prohibit any inquiry into whether the parent's statement of religious objection was in good faith. Dep't of Health v. Curry, 722 So.2d 874 (Fla. 1st DCA 1998). In reaching its conclusion, this Court noted that "two very important social policies" were at issue: "the desire to protect the public health and welfare and the desire to protect a parent's fundamental right to raise his or her child according to the religious tenets that he or she chooses." Id. at 877. When the "two policies collide" the parental interest is afforded "greater protection ... by prohibiting any inquiry by the Department into the bona fides of the parent's or guardian's objection." Id.

Turning back to Mr. Flynn's claims, the Diocese moved to dismiss them based on its view that all children to be enrolled in its schools "must be properly immunized for the common good" and that this "requirement is a religious tenet and practice" of the Diocese. It contended that it could not be compelled by a secular tribunal to comply with the statutory religious exemption, which would invade its ecclesiastical sovereignty as to an internal church policy and violate the First Amendment's free exercise and establishment clauses. It said that resolution of Mr. Flynn's request to declare his religious objection valid and *1245 to admit his non-immunized child to Holy Spirit would "inappropriately entangle [the trial court] in constitutionally protected church doctrine" and improperly place it in the position of determining "the religious morals, tenets and practices of a given religion."

At the hearing, Mr. Flynn was the only witness, testifying that "to vaccinate our children would be deep within our conscience to offend God." Post-hearing, the Diocese provided supplemental documentation including excerpts of the Catholic Church's Code of Canon Law regarding the "Role of a Bishop" and the "Recourse Against Administrative Decrees," which the trial court held "plainly evidence a hierarchical decision-making process"

Flynn v. Estevez, 221 So.3d 1241 (2017)
346 Ed. Law Rep. 653, 42 Fla. L. Weekly D1443

and "avenues by which church members may seek redress as to matters decided by a Bishop." No materials were submitted to the trial court that discuss the specific religious foundation of the Diocese's prior or current policies on immunizations (including no Biblical references or citations), nor did any witness on behalf of the Diocese testify as to such matters.

In a detailed written order, the trial court denied relief to Mr. Flynn, holding that the merits of his claim could not be addressed because of the church autonomy doctrine, stating the following:

> The State of Florida by statute has provided parents what the Free Exercise Clause of the First Amendment does not: a right based on religious belief to exempt their school-age children from mandatory statutory immunization. In the case at bar, the Court is presented with a conflict between a *statutory* right provided to parents and a ***Constitutional*** right provided to the church. A statute must always yield to the Constitution.
>
> The Florida statute on immunizations, including the section on religious exemptions, remains valid and enforceable except that the exemption cannot be applied to a church in such a manner as to constitute a governmental intrusion into the church's right to determine the operation of its parochial schools. Where that conflict arises, the statute is unconstitutional as applied, and the civil courts may not insert themselves into the operation of the church to compel it to exempt a student on religious grounds from mandatory immunization, nor to admit an unimmunized student to the school.

Because Mr. Flynn had no likelihood of succeeding on the merits (due to the church autonomy doctrine's application), and proved only one of the three other requirements for injunctive relief,[5] the trial court denied relief and dismissed the action. This appeal resulted.

## II.

[1] [2]The church autonomy doctrine, or ecclesiastical abstention doctrine, prevents civil courts from deciding matters that require adjudication of "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them," Watson v. Jones, 80 U.S. 679, 733, 13 Wall. 679, 20 L.Ed. 666 (1871), such

that "secular courts must accept the decision by the highest ecclesiastical authority on such matters."[6] *1246 The doctrine precludes secular courts from becoming arbiters of religious matters and the circumvention or erosion of church doctrine by those who disagree with it.[7]

[3]The doctrine, which has roots in both the free exercise and establishment clauses of the United States Constitution, U.S. CONST. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof"), has its core application in cases where a court intrudes on a church's autonomous management of its own internal affairs and property, thereby either burdening or inhibiting the exercise of religious freedom (free exercise clause) or fostering an excessive government entanglement with religion (establishment clause).[8] The doctrine has parallels to the "ministers exception" with which it shares the common feature of allowing churches to exercise their religious freedoms without governmental interference into its internal affairs. Hosanna–Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C., 565 U.S. 171, 196, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012) ("When a minister who has been fired sues her church alleging that her termination was discriminatory, the First Amendment has struck the balance for us. The church must be free to choose those who will guide it on its way."). As the Seventh Circuit has noted, the ministers exception is a misnomer that "is better termed the 'internal affairs' doctrine" because:

> In a religious nation that wants to maintain some degree of separation between church and state, legislators do not want the courts to tell a church whom to ordain (or retain as an ordained minister), how to allocate authority over the affairs of the church, or which rituals *1247 and observances are authentic.... The courts are not to resolve schisms or review excommunications.

Schleicher v. Salvation Army, 518 F.3d 472, 475 (7th Cir. 2008) (citation omitted). In Florida, courts have interpreted the doctrine as a jurisdictional bar, meaning a claim should be dismissed upon a determination that it requires adjudication of a religious matter. See Bilbrey v. Myers, 91 So.3d 887, 891 (Fla. 5th DÇA 2012) (noting that most courts deem it an issue of subject-matter

jurisdiction while others deem it a defense or a matter of justiciability, but stating that "[t]o date, Florida courts have treated the prohibition as a bar to subject-matter jurisdiction").

[4]The scope of the doctrine is not unlimited; courts have held that the application of a neutral law that does not require inquiry into or resolution of an ecclesiastical matter may be permissible, for example by the application of secular tort claims by third parties against a religious institution,[9] allegations of fraudulent misrepresentation,[10] or claims of breach of contract.[11] As our Court has observed, a "church or religious organization seeking to avoid application of the law must first show why application of the law requires adjudication of an ecclesiastical matter." Archdiocese of Miami, 945 So.2d at 529; see also Malicki, 814 So.2d at 360 ("[T]he 'threshold inquiry is whether there is a conflict between conduct that is required by law and conduct that is prohibited by religious principles.' ") (quoting Smith v. O'Connell, 986 F.Supp. 73, 78 (D.R.I. 1997)). Simply because a church is involved as a litigant does not make the matter a religious one; instead, inquiry must be made as to the nature of the dispute and whether it can be decided on neutral principles of secular law without a court intruding upon, interfering with, or deciding church doctrine.

[5] [6]The Diocese claims that resolution of this case necessarily requires a civil court to decide matters of church governance and theological controversy, and that, accordingly, jurisdiction is lacking. Its claim to ecclesiastical autonomy in this case is well-founded in many respects though not without its blemishes. First of all, the focal point of the litigation is the application of a *religious* exemption from an otherwise religion-neutral state immunization law against a *religious* institution, the latter seeking immunization from the former. To begin, neutral state laws compelling immunizations are generally considered to be constitutionally valid ones that do not violate religious freedoms.[12] Florida's immunization law falls into this *1248 category,[13] such that we must necessarily reject Mr. Flynn's claim at the outset to a free-standing federal or state constitutional right[14] of religious freedom to refuse immunizations for his child as a condition of school admission. Developments in immunological medicine and legal doctrine could alter the current consensus, but no precedent yet exists in support of a generalized constitutional right against immunizations.

[7]Preliminarily, Mr. Flynn argues that if the Legislature had wanted a religious school to have the right to refuse admission on religious grounds to non-immunized student

applicants it could have said so in the statute. But a legislative license isn't needed to exercise a constitutional freedom. Archdiocese of Miami, 945 So.2d at 531 ("[A]bsent the requirements of the First Amendment ... the statute must yield to the United States Constitution."). Instead, the question properly framed is whether the Diocese's constitutional freedoms would be sufficiently compromised if civil courts compel the admission of non-immunized students to its private, religious schools.

Turning to the religious exemption, whether the Diocese must comply with it by honoring Mr. Flynn's statutory right to except his son from immunization at the school presents a novel question. At first glance, the exemption is neutral in the sense that it does not limit itself to a specific religion;[15] require inquiry into the motivations or sincerity of the beliefs of those who invoke the exemption;[16] or permit *1249 governmental discretion as to what constitutes a valid or recognized religion under the exemption.[17] As our Court has held, the Legislature could have written the exemption to require some degree of inquiry as to the genuineness of the religious objection, but it did not; indeed, the Legislature may have deemed it ill-advised to give the State the power to do so, which would inject the government into religious disputes. Curry, 722 So.2d at 877 (noting the potential for "danger" of giving the Department of Health "the authority to determine the bona fides of such objections would pose to the free exercise of religion guaranteed by both the federal and state constitutions").

[8]For similar reasons, it becomes apparent that the application of the statutory exemption to the Diocese is problematic due to the intramural ecclesiastical kerfuffle that underlies this dispute. The Diocese has a religiously-based immunization policy with which one of its members disagrees; Mr. Flynn seeks the power of the State to compel the Diocese to depart from its point-of-view and admit his non-immunized son. But doing so would further his own religious views at the expense of the Diocese's on the topic of immunizations. We are convinced that a secular court should not be making the judgment as to which side's religious view of immunization is to be respected. Emp't Div., Dep't of Human Res. of Or. v. Smith, 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) ("The government may not ... lend its power to one or the other side in controversies over religious authority or dogma."), superseded by statute, Religious Freedom Restoration Act, 42 U.S.C.A. § 2000bb(1) (Nov. 16, 1993), held unconstitutional by Cty. of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Unlike other church autonomy cases, the unique feature of this one is that both parties assert Catholic religious doctrine as the basis for their

Flynn v. Estevez, 221 So.3d 1241 (2017)

346 Ed. Law Rep. 653, 42 Fla. L. Weekly D1443

litigation positions, which cautions against a secular court wading into the squabble.[18] We do not suggest a different result if a Presbyterian, Hindu, or Jewish parent asserted a religious objection at Holy Spirit, but the wholly intra-church nature of the dispute makes resolution of the legal question more straight-forward.

Moreover, we have little pause in concluding that the issue of immunization is simultaneously a secular/scientific one as well as one involving religious faith and ecclesiastical morality; most matters of public concern have concurrent viewpoints from secular, scientific, religious, and moral perspectives. Every state requires that students be vaccinated (excepting out those with medical contraindications and the like),[19] reflecting the secular, scientific *1250 consensus that immunization is necessary; at the same time, all but three states have statutory religious exemptions, reflecting that immunization has a pervasive and obvious religious dimension in our Nation.[20] In light of the near countrywide availability of a statutory right to object to compulsory student vaccinations on religious grounds, we cannot hold, as Mr. Flynn asserts, that resolution of the conflict between his religious objection and the Diocese's immunization policy is a purely secular one, requiring only the application of neutral legal principles. Civil courts may adjudicate a dispute under the neutral principles of law approach provided they do not make "inquiry into religious doctrine" and are not "resolving a religious controversy" in doing so. Se. Conference Ass'n of Seventh–Day Adventists, Inc. v. Dennis, 862 So.2d 842, 844 (Fla. 4th DCA 2003) (citing Jones v. Wolf, 443 U.S. 595, 602–04, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979)). Refereeing a religious dispute about student immunization between a Catholic diocese and one of its parishioners requires deciding which religious view should prevail, a function from which a secular court should abstain. The Diocese is hierarchical,[21] its official documents showing that it is the highest authority on internal religious matters within its geographic area. We are not presented with a "purely secular" dispute involving a church and a third party;[22] instead, we have a religious disagreement between a church and one of its members for which abstention is appropriate.

Mr. Flynn claims the Diocese's vaccination policy must be actually rooted in a specific religion doctrine, tenet, or text, and that its "general concern about the 'common good ' " is a religiously ineffectual basis for invoking the abstention doctrine. Though the trial court wasn't presented with the specific religious basis for the Diocese's new policy,[23] we find no fault in *1251 its conclusion that "immunizations of children attending Catholic schools is an issue of faith, discipline, and

Catholicism [that] can only properly be determined by the church and not by the civil courts." Courts are in no more of a position to compel the Diocese to provide a sufficient quantum of passable proof that its view of immunization is consistent with the Catholic faith than to do so as to Mr. Flynn's personal views of Catholic doctrine on the very same subject. See Malicki, 814 So.2d at 355–56 (" '[I]t is not within the "judicial function and judicial competence" ' of civil courts to determine which of two competing interpretations of scripture are correct.") (quoting United States v. Lee, 455 U.S. 252, 256, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982)). Mr. Flynn points out that he has no duty to prove that his objection is religious, citing Curry, yet he insists that the Diocese must provide adequate proof that sufficiently grounds its religious viewpoint in specific church tenets. We can't help but note the incongruity of giving primacy to a parishioner's religious viewpoint that is contrary to that of his mother-church on the same topic; respectfully, it would be an odd role reversal—a devotee's tail wagging the corpus of church leadership—to do so. Schleicher v. Salvation Army, 518 F.3d 472, 477 (7th Cir. 2008) (workers administering Salvation Army rehabilitation centers and thrift shops fall within ministers exception, cautioning that the "commercial tail must not be allowed to wag the ecclesiastical body"). On this point, we find no fault with the trial court's conclusion that the Diocese's student immunization policy is a matter of "faith, discipline, and Catholicism" that furthers the "public good," particularly as to those who are poor or afflicted with diseases and other maladies who benefit from an immunized populace. That the Diocese's policy happens to be consistent with secular notions of the "public good" does not diminish or negate its religious nature. Given that the issue of student immunization is one of widespread theological debate, and that the dispute in this case is purely intra-church, we see no basis for remanding to compel the Diocese to explicate the ecclesiastical particulars of its policy.

Moreover, the Catholic Church's governance of its parochial schools is inherently religious, its obvious mission being the transmission of its religious values, as recognized in caselaw beginning decades ago. See, e.g., Ams. United for Separation of Church & State v. Oakey, 339 F.Supp. 545, 551 (D. Vt. 1972) (noting that both parties agreed that "Roman Catholic parochial schools ... are a part of the religious mission of the Catholic Church" and that "[a]ll the church schools are vehicles for transmitting the faith of the sponsoring church to the next generation"); see also Lemon v. Kurtzman, 403 U.S. 602, 616, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (noting district court findings that "parochial schools constituted 'an integral part of the religious mission of the Catholic Church' " making them " 'a powerful vehicle for

Flynn v. Estevez, 221 So.3d 1241 (2017)

346 Ed. Law Rep. 653, 42 Fla. L. Weekly D1443

transmitting the Catholic faith to the next generation' "). In this context, courts have been cautious to interfere with matters of church governance of schools and educational **\*1252** endeavors, the thought being that a church's educational mission is part of its central nervous system as an inculcator of spiritual values.[24] This makes sense because protecting churches from secular intrusion into inculcation of core religious tenets is a foundational principle animating the doctrine.[25] The degree of risk of governmental intrusion into and possible entanglement with the Diocese's operation of its school as to immunization policy is uncertain. On the one hand, the state compels that the Diocese have a policy that excepts religious objectors and that some record-keeping be done; on the other hand, the impact of allowing non-immunized students to matriculate—contrary to the Diocese's religious policy—undermines religious authority and sends the message that the secular government can, by statute, take away a constitutional freedom. It would be akin to a final judgment on a religious matter:

> Such a judgment could cause confusion, consternation, and dismay in religious circles. The commingling of religious and secular justice would violate not only the injunction in *Matthew* 22:21 to "render unto Caesar the things which are Caesar's, and unto God the things that are God's," but also the First Amendment, which forbids the government to make religious judgments. The harm of such a governmental intrusion into religious affairs would be irreparable ...

*McCarthy*, 714 F.3d at 976 (discussing the irreparable harm from allowing a jury to decide whether a nun was a member of the church in the context of the collateral order doctrine, which allows for interlocutory appeals). If anything, the potential harm from secular intrusion on the Diocese's religious governance of its schools is enough to warrant pause; as we said recently, "the controversy is solely over how the Church should govern itself—an essentially **\*1253** religious matter." *Rosenberger*, 72 So.3d at 204. To interlineate our holding in that case with this one, "[w]e can discern no way under the facts of this case to draw a clean line between essentially religious matters protected by the First Amendment and matters of [immunization] law." *Id.* at 204–05.

### III.

In this case, a Catholic parent's statutory religious exception for student immunizations runs head-on into the

Catholic Church's constitutional religious freedoms to operate its parochial schools without governmental interference. The trial court was correct to abstain from deciding whose religious views on the matter should prevail.

AFFIRMED.

BILBREY, J., concurs with opinion, KELSEY, J., concurs in result only with opinion.

BILBREY, J., concurring.

I join in Judge Makar's opinion. I write separately to emphasize that although this case involves an "intramural" dispute with adherents of the same religion, the church autonomy doctrine would apply even if Mr. Flynn was not Catholic. The doctrine simply holds that a state or federal court generally cannot intervene in matters of church affairs. There are, as Judge Makar explains, certain important exceptions to this limitation on jurisdiction which do not apply here. Application of the church autonomy doctrine does not require a dispute between two religious points of view.

The "church autonomy doctrine" arises from "a long line of Supreme Court cases that affirm the fundamental right of churches to 'decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.' " *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 462 (D.C. Cir. 1996) (quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116, 73 S.Ct. 143); *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648 (10th Cir. 2002). The doctrine does not shield a church from liability in tort or for breach of contract. *Rayburn v. General Conference of Seventh–Day Adventists*, 772 F.2d 1164, 1168 (4th Cir.1985); *Bryce*, 289 F.3d at 657. Also, certain hiring practices may be subject to scrutiny. *Rayburn*, 772 F.2d at 1171; *Bryce*, 289 F.3d at 657; *Malicki v. Doe*, 814 So.2d 347 (Fla. 2002). Before applying the doctrine, it must be first determined with the conduct being challenged is "rooted in religious belief." *Wisconsin v. Yoder*, 406 U.S. 205, 215, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). Here, the conduct being challenged is the Diocese's decision to require immunization, a requirement that is said to be religiously based.

All that is required for application of the doctrine is for a

Flynn v. Estevez, 221 So.3d 1241 (2017)
346 Ed. Law Rep. 653, 42 Fla. L. Weekly D1443

church or ecclesiastical body to take a position on religious grounds; it matters not that the opponent of the church have a religious basis in opposition. As Judge Makar observes, "the Catholic's Church governance of its parochial schools is inherently religious, its obvious mission being the transmission of religious values...." (Maj. Op. at 1251). In my view, that is all that is needed in order to invoke the "church autonomy doctrine." Whatever rights Mr. Flynn may have under section 1003.22(5)(a), Florida Statutes, such rights are of no consequence under the doctrine. Mr. Flynn's only recourse would be to find an exception to the application of the doctrine, which he has not done.

Perhaps all of the above is a minor point. But, I would not want to create the notion that the invocation "church autonomy doctrine" depends on a clash of theological *1254 or religious views. The doctrine's reach is greater than that.

KELSEY, J., concurring in result only.

This case can be resolved easily and expeditiously under well-settled precedent. The Diocese asserted the common-good principle as a foundational religious tenet supporting its vaccination requirement. The law does not require the Diocese to defend or substantiate its beliefs, but the Diocese indicated that it derived this tenet from well-known Biblical admonitions to elevate the interests of others above one's own. See, e.g., Leviticus 25:35 (imposing obligation to relieve the poverty of others); Matthew 7:12 (articulating the "Golden Rule" of giving others the same consideration and treatment you would want to receive); Matthew 22:37–39 (commanding to love others as much as self); Philippians 2:1–8 (admonishing to consider others more important than self). See Gwyneth A. Spaeder, The Moral Obligation to Vaccinate:

Autonomy and the Common Good, Nat'l Cath. Bioethics Q., Summer 2016, at 245, 245, 247.

Although a vaccination requirement may create a moral dilemma for Catholics and others who oppose the development of vaccines using cell lines from tissue harvested from abortions—see id. at 249–51—that was not Mr. Flynn's objection. Mr. Flynn disagreed with the Diocese's common-good tenet, instead asserting his contrary belief in the supremacy of what he considered a faith-based "well-formed consciences of parents" right with respect to matters involving their children, particularly introducing foreign substances into their children's bodies. Mr. Flynn also argued that the availability of a statutory exemption from vaccination under section 1003.22(5)(a) of the Florida Statutes trumped the Diocese's First–Amendment rights.

The trial court correctly refused to become entangled in this dispute. Our Constitutional protections according to their plain meaning and longstanding application do not allow the government to reject a religious tenet or re-label it as secular in order to subject a religious institution or an individual to government control. Amend. 1, U.S. Const. (embodying Free–Exercise Clause and Establishment Clause); Malicki v. Doe, 814 So.2d 347, 355–56, 360 (Fla. 2002) (recognizing prohibition of government and judicial entanglement in matters of church governance, faith, and doctrine); Malichi v. Archdiocese of Miami, 945 So.2d 526, 529 (Fla. 1st DCA 2006) (enforcing church autonomy doctrine).

**All Citations**

221 So.3d 1241, 346 Ed. Law Rep. 653, 42 Fla. L. Weekly D1443

Footnotes

1    The Diocese points out that no written objection is in the record, but Mr. Flynn's testimony on the matter is sufficient and the trial court's finding that Flynn "provided Holy Spirit Catholic School and Bishop Estevez a written objection pursuant to [the statute]" is not in dispute.

2    See States With Religious and Philosophical Exemptions From School Immunization Requirements, National Conference of State Legislatures (Aug. 23, 2016) at http://www.ncsl.org/research/health/school-immunization-exemption-statelaws.aspx ("All 50 states have legislation requiring specified vaccines for students.").

3    The statutory definition notes that a "private school may be a parochial, religious, denominational, for-profit, or nonprofit school." § 1002.01(2), Fla. Stat. (2007).

4    Section 1002.42(6)(a) (2016), Florida Statutes, states that the "governing authority of each private school shall: (a) Require

Flynn v. Estevez, 221 So.3d 1241 (2017)

346 Ed. Law Rep. 653, 42 Fla. L. Weekly D1443

students to present a certification of immunization in accordance with the provisions of s. 1003.22(3)–(11)." In turn, section 1003.22, Florida Statutes, which deals with school-entry health examinations and immunizations, states that "Each district school board and the governing authority of each private school shall establish and enforce as policy that, prior to admittance to or attendance in a public or private school, grades kindergarten through 12, or any other initial entrance into a Florida public or private school, each child present or have on file with the school a certification of immunization for the prevention of those communicable diseases for which immunization is required by the Department of Health ...." § 1003.22(4), Fla. Stat. (2017). The Diocese's participation in the Florida Tax Credit Scholarship Program also requires that it comply with these requirements as to immunizations and its exemptions. See § 1002.421(1), Fla. Stat. (2013) ("A Florida private school participating in the Florida Tax Credit Scholarship Program ... must comply with all requirements of this section in addition to private school requirements outlined in s. 1002.42.").

5      In denying injunctive relief, the trial court concluded that Mr. Flynn had no adequate remedy at law, but that irreparable injury would not result because his child "may attend public school, where he may avail himself of Florida's religious exemption from mandatory immunization, or he may attend another private (including religious) school [that] permits him to claim such exemption." As to the public interest, the trial court found it would be served if more, rather than fewer, school children were immunized.

6      Malichi v. Archdiocese of Miami, 945 So.2d 526, 529 (Fla. 1st DCA 2006); see Watson, 80 U.S. at 727 ("[W]henever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them."); see also Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am., 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952) ("[Watson v. Jones] radiates ... a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.").

7      See Serbian E. Orthodox Diocese for U.S. of Am. & Canada v. Milivojevich, 426 U.S. 696, 709, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976) ( "First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them."); Watson, 80 U.S. at 729 ("But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed."); McCarthy v. Fuller, 714 F.3d 971, 975 (7th Cir. 2013) ("A secular court may not take sides on issues of religious doctrine."). Of course, "[a] secular court must be allowed to decide ... whether a party is correct in arguing that there is an authoritative church ruling on an issue, a ruling that removes the issue from the jurisdiction of that court." McCarthy, 714 F.3d at 976.

8      See, e.g., Kedroff, 344 U.S. 94, 73 S.Ct. 143 (statute transferring control of churches violates free exercise of religion); Watson, 80 U.S. 679 (pre-incorporation case involving dispute between members of church); Rosenberger v. Jamison, 72 So.3d 199, 203 (Fla. 1st DCA 2011) (holding that because "the underlying dispute concerns the Church's form of governance ... the First Amendment prohibits civil courts from adjudicating such ecclesiastical matters"); Archdiocese of Miami, 945 So.2d at 532 (adjudicating Catholic priest's claim to workers compensation "would excessively entangle civil courts in the resolution of a completely internal church matter involving no third parties").

9      See Malicki v. Doe, 814 So.2d 347, 351 (Fla. 2002) ("First Amendment does not provide a shield behind which a church may avoid liability for harm caused to an adult and a child parishioner arising from the alleged sexual assault or battery by one of its clergy."); Bilbrey, 91 So.3d at 891 (church autonomy doctrine does not preclude claims based on neutral tort principles such as defamation and breach of fiduciary duty).

10     See Favalora v. Sidaway, 995 So.2d 1133, 1135 (Fla. 4th DCA 2008) (holding that church autonomy doctrine does not bar claims arising from fraudulent misrepresentation that induces someone not to drop a civil suit).

11     Bendross v. Readon, 89 So.3d 258, 261 (Fla. 3d DCA 2012) (holding that neutral statute governing not-for-profit corporations could be applied "without inquiry into religious doctrine and without requiring the court to interpret the policies or practices of the [church], the abstention doctrine does not bar this case").

12     See Phillips v. City of N.Y., 775 F.3d 538, 543 (2d Cir. 2015) ("[M]andatory vaccination as a condition for admission to school does not violate the Free Exercise Clause.") (agreeing with Workman v. Mingo Cty. Bd. of Educ., 419 Fed.Appx. 348, 353–54 (4th Cir.2011) and citing Prince v. Mass., 321 U.S. 158, 166–67, 64 S.Ct. 438, 88 L.Ed. 645 (1944)), cert. denied sub nom. Phillips v. City

**Flynn v. Estevez, 221 So.3d 1241 (2017)**

346 Ed. Law Rep. 653, 42 Fla. L. Weekly D1443

of N.Y., N.Y., ——U.S. ——, 136 S.Ct. 104, 193 L.Ed.2d 37 (2015); Boone v. Boozman, 217 F.Supp.2d 938, 954 (E.D. Ark. 2002) ("The Supreme Court has long recognized that a state may require public and private school children to be immunized. The constitutionally-protected free exercise of religion does not excuse an individual from compulsory immunization; in this instance, the right to free exercise of religion and parental rights are subordinated to society's interest in protecting against the spread of disease."); Douglas Cty. v. Anaya, 269 Neb. 552, 694 N.W.2d 601, 608 (2005) (law requiring metabolic testing of newborns "is a neutral law" that applies "to all babies born in the state and does not discriminate as to which babies must be tested. Its purpose is not directed at religious practices or beliefs."); see generally Prince, 321 U.S. at 166–67, 64 S.Ct. 438 (persuasive dicta saying that the "right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death"); see also Sean Coletti, Taking Account of Partial Exemptors in Vaccination Law, Policy, and Practice, 36 Conn. L. Rev. 1341, 1342 (2004) (footnotes omitted) ("Today, mandatory vaccination statutes stop the epidemic spread of disease through less than universal vaccination; this effect is commonly referred to as 'herd immunity.' While a certain number of vaccinations are considered 'mandatory' in every state for public school attendance, the compulsory nature is limited to the exclusion of unvaccinated children during outbreaks, while unvaccinated preschoolers can be barred from school altogether.").

13    See Moore v. Draper, 57 So.2d 648, 650 (Fla. 1952) ("Religious freedom cannot be used as a cloak for any person with a contagious or infectious disease to spread such disease because of his religion.").

14    In relevant part, the Florida Constitution says: "There shall be no law respecting the establishment of religion or prohibiting or penalizing the free exercise thereof. Religious freedom shall not justify practices inconsistent with public morals, peace or safety." Art. I, § 3, Fla. Const. (2017).

15    See Children's Healthcare Is a Legal Duty, Inc. v. Min De Parle, 212 F.3d 1084, 1090 (8th Cir. 2000) (replacement of sect-specific language with neutral language "does not facially differentiate among religious sects, for its terms, legislative history, and effect all suggest denominational neutrality").

16    See Curry, 722 So.2d at 877 (holding that when the "desire to protect the public health and welfare" conflicts with the "desire to protect a parent's fundamental right to raise his or her child according to the religious tenets that he or she chooses, ... greater protection [will] be afforded to the latter by prohibiting any inquiry by the Department into the bona fides of the parent's or guardian's objection").

17    See Boone, 217 F.Supp.2d at 942 (statute that creates exemption where "immunization conflicts with the religious tenets and practices of a *recognized church or religious denomination* of which the parent or guardian is an adherent or member" held to be unconstitutional).

18    We recognize the seeming anomaly, as did the trial court, that Mr. Flynn may exercise his religious exemption at a public school, a non-religious private school, or even a private religious school that wishes to recognize it, which exists for two primary reasons related to a constitution's hierarchy of values. First, Florida's education laws, like those of most states, require religious accommodation by public and private schools but grant private religious schools more leeway in the operation of their schools to preserve free exercise rights. Second, constitutional rights create asymmetries in favor of protected freedoms such that statutory and other lesser rights must give way if they conflict or cannot coexist with the former.

19    See Martha McCarthy, Student Vaccination Requirements:   Can Nonmedical Exemptions Be Justified?, 320 Ed. Law Rep. 591, 595 (2015) ( "Every state allows medical exemptions for children who are medically fragile, have compromised immune systems, or for some other medical reason should not be vaccinated.").

20    States With Religious and Philosophical Exemptions From School Immunization Requirements, National Conference of State Legislatures (Aug. 23, 2016) at http://www.ncsl.org/research/health/school-immunization-exemption-statelaws.aspx. Notably, eighteen states "allow philosophical exemptions for those who object to immunizations because of personal, moral or other beliefs." Id. As two commentators recently noted:
Religious objections are complex in nature. State legislators considering religious exemptions must grapple with the tension between preserving parents' First Amendment interests in religious freedom and maintaining herd immunity to protect public health. Additionally, unlike a medical diagnosis which can be clinically assigned by a licensed health professional, religious exemptions are uniquely personal in nature and may not fit any recognized metric. Religious practice and belief is highly individualized and there is often a great deal of disagreement regarding religious objection or acceptance of vaccination even within individual religions.
Christine Kiracofe, and Nicholas Atwood, Giving Kids A (Required) Shot:   Mandatory Vaccination Laws and Exceptions for Public

Flynn v. Estevez, 221 So.3d 1241 (2017)

346 Ed. Law Rep. 653, 42 Fla. L. Weekly D1443

K–12 Students in the United States, 324 Ed. Law Rep. 611, 614 (2016).

21    Kedroff, 344 U.S. at 110, 73 S.Ct. 143 ("Hierarchical churches may be defined as those organized as a body with other churches having similar faith and doctrine with a common ruling convocation or ecclesiastical head.").

22    As our supreme court has noted:
      A court ... must determine whether the dispute "is an ecclesiastical one about 'discipline, faith, internal organization, or ecclesiastical rule, custom or law,' or whether it is a case in which [it] should hold religious organizations liable in civil courts for 'purely secular disputes between third parties and a particular defendant, albeit a religiously affiliated organization.' " Malicki, 814 So.2d at 357 (citations omitted).

23    After appellate briefing concluded, the Diocese filed as supplemental authority an article from a Catholic bioethics center that sets forth a detailed discussion of the religious and moral underpinnings establishing that immunization is a religious duty of Catholics. Gwyneth A. Spaeder, The Moral Obligation to Vaccinate: Autonomy and the Public Good, 16.2 National Catholic Bioethics Quarterly 245 (2016). The article—which does not purport to be an authoritative document or sacred text of the Catholic Church—is akin to a secondary authority, much like a law review, that advocates a viewpoint on the matter. Though we do not rely upon it substantively, we view it as supportive of the conclusion that the trial court confronted an inherently religious question that justified abstention.

24    See Oakey, 339 F.Supp. at 551 (issuing injunction to prevent state government from implementing statute limiting aid to schools to the teaching of specific secular subjects); Dlaikan v. Roodbeen, 206 Mich.App. 591, 522 N.W.2d 719, 720 (1994); (upholding lack of jurisdiction over claim that religious school denied student admission, saying "there can be no distinction between a church providing a liturgical service in its sanctuary and providing education imbued with its religious doctrine in its parochial school"); In re St. Thomas High Sch., 495 S.W.3d 500 (Tex. Ct. App. 2016) (upholding application of ecclesiastical abstention doctrine to expulsion of student); see also N.L.R.B. v. Catholic Bishopof Chi., 440 U.S. 490, 502, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) (interpreting federal statute to avoid "a significant risk that the First Amendment will be infringed" via the National Labor Relations Board's encroachment on operations of church-operated schools).

25    Indeed, matters of religious faith and governance oftentimes arise in the public schools, involving activities such as prayer, saying the Pledge of Allegiance or saluting the flag, teaching religion and the use of religious texts, curricular decisions such as the evolution/creationism and contraceptive debates, and dress codes. See, e.g., Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (student-led, student-initiated invocations prior to football games); Lee v. Weisman, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) ("nonsectarian" prayer by clergyman at graduation ceremony); Wallace v. Jaffree, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (daily period of silence for meditation or voluntary prayer); Lemon, 403 U.S. 602, 91 S.Ct. 2105 (textbooks and instructional materials); Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (wearing armband as protest of Vietnam war); Sch. Dist. of Abington Tp., Pa. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (bible reading and prayer); Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (program of daily classroom invocation); W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (saluting flag). A private religious school might deem these activities compulsory for its student body as means of establishing proper morals and devotion to one's religion or country, a decision shielded by its religious freedom rights.

End of Document                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.